# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 18, 2015 Session

## IN RE: KYAH H., ET AL.

### Appeal from the Juvenile Court for Knox County
### No. 71452     Tim Irwin, Judge

---

### No. E2015-00806-COA-R3-PT-FILED-DECEMBER 23, 2015

---

Marshall H. ("Father") appeals the judgment of the Juvenile Court for Knox County ("the Trial Court") terminating his parental rights to the minor children, Kyah H., Marshall C., and Jhazaria T. (collectively "the Children"), on the grounds of abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), and severe child abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4). We find and hold that the evidence does not preponderate against the Trial Court's findings made by clear and convincing evidence that grounds for termination were proven and that termination was in the best interest of the Children, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J. and THOMAS R. FRIERSON, II, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Marshall H.

Herbert H. Slatery, III, Attorney General and Reporter; and Jason I. Coleman, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

## OPINION

### Background

The Department of Children's Services ("DCS") filed its petition seeking to terminate Father's parental rights to the Children in November of 2014. Kyah and Marshall have the same biological mother. Jhazaria has a different biological mother. Neither of the biological mothers is involved in this suit, which was filed solely to

terminate Father's parental rights to Kyah, Marshall, and Jhazaria. The case proceeded to trial in April of 2015.

Kendrise Colebrooke, the DCS family services worker assigned to the Children's case, testified at trial. Ms. Colebrooke testified that she began working on the case in February of 2014 and continued to work on the case to the time of trial. The Children have been in State custody during this entire time period.

Ms. Colebrooke testified about a custody incident, which occurred in 2005, with regard to Kyah and Marshall. Ms. Colebrooke stated that a non-relative petitioned for custody of these two children and that a petition for emergency removal also was filed at that time by a guardian ad litem. Ms. Colebrooke explained that the parents fled to New Jersey with the two children, and the case was closed and dismissed due to an inability to locate the children.

In 2006, New Jersey requested that Tennessee place Marshall in the custody of Tennessee. At that time, Marshall was in a hospital in Pennsylvania with a right humerus fracture and water intoxication. Kyah was living in Tennessee at that time. Ms. Colebrooke testified that the request made by New Jersey was denied by the State of Tennessee, but the placement occurred anyway.

Ms. Colebrooke testified that the next custody incident involved Jhazaria and Roy, a half-brother of Jhazaria's by a different father. DCS alleged that these children were dependent and neglected due to their mother's drug use and incarceration. Father attended the preliminary hearing in that case in 2010. DCS requested a trial home placement, and Father was granted full custody of Jhazaria and Roy. At that time, Father also had Kyah, Marshall, and three other children living with him, for a total of seven children living in Father's home. The three other children are the children of Father's wife, Kacey H.[1]

Allegations of severe physical abuse involving a child in Father's home were brought to the attention of DCS in 2013. A restraining order was put into place to protect the children in Father's home, and others, from Father who was the abuser. An order was entered on March 18, 2014 finding two of the children in Father's home to have been severely abused by Father. Father did not appeal this order.

The Children were taken into State custody when Kacey H., Father's wife, with whom the Children had been living, brought them to DCS because her home was being

---

[1] Kacey H.'s first name is spelled several different ways within the record on appeal including as 'Kacey,' 'Kasey,' 'Kacie,' and 'Casey.' We are unable to determine from the record now before us the correct spelling.

foreclosed upon, and she was unable to care for Father's children[2]. Ms. Colebrooke testified that Father's incarceration caused Kacey H. financial instability because the house was in Father's name.

At the time of trial, Kyah and Marshall were in a relative placement with Father's aunt in New Jersey. They have been in this placement since January of 2015. Ms. Colebrooke testified that Father's aunt is in a position to adopt Kyah and Marshall should they become available for adoption. Father has had no contact with Kyah or Marshall since the entry of the restraining order in 2013.

At the time of trial, Jhazaria was living in a foster home in Tennessee along with her brother Roy. Ms. Colebrooke testified that the foster home is a possible adoptive home for Jhazaria should she become available for adoption. She also testified that Jhazaria's mother was working toward possible reunification with her children. Ms. Colebrooke stated: "So we have a plan A and B for those two children."

Ms. Colebrooke testified that the restraining order provided a list of things for Father to do in order to regain contact with the Children including have a mental health assessment, attend anger management treatment, attend domestic violence classes, obtain stable and appropriate housing, and pass random drug screens. Ms. Colebrooke testified that Father never has provided DCS with any documentation or proof that he has taken any of these steps.

When asked if the Children have asked about Father, Ms. Colebrooke testified that they only asked when they first came into custody in February of 2014. She testified that they expressed concern at that time for the safety of their mother from Father. The Children told Ms. Colebrooke about the incident where Father assaulted their mother. Ms. Colebrooke explained that the Children were referring to Kacey H., with whom the Children were living at the time of the incident.

Ms. Colebrooke testified that Father was incarcerated at the time of trial serving two three-year concurrent sentences for aggravated burglary and aggravated assault resulting from his breaking into Kacey H.'s home and assaulting her with a baseball bat. Ms. Colebrooke testified that she believes that it is in the Children's best interest for Father's parental rights to be terminated. Ms. Colebrooke was asked about her last contact with Father, and she stated that she received a letter from Father in December of 2014 in which Father stated that he was enrolling in anger management classes and alcohol and drug treatment and that he had completed domestic violence classes. Ms. Colebrooke stated that she attempted to make contact with Father through his case manager, but had been unable to do so.

---

[2] In addition to the Children, Kacey H. also brought Jhazaria's brother Roy to DCS. Although Roy was in Father's custody, he is neither Father's nor Kacey H.'s child.

Jhazaria's foster father ("Foster Dad") testified at trial. Foster Dad was asked about his intent regarding a placement for Jhazaria, and he stated:

> Originally our intent was to give her a safe place while the best interest of her was determined. That went on month to month and she's been with us now five months. And at this point we're uncertain of her future, so we decided to offer our home as another offer to adopt her.

Foster Dad testified that there are five people living in his home, him and his wife, Jhazaria and her brother Roy, and the foster parent's older son who is almost nineteen years old and living with them until he leaves for the military in August of 2015. Jhazaria and her brother are not the first foster children to live with Foster Dad and his wife. Foster Dad explained that he and his wife have been foster parents for approximately five years, and that they adopted the nineteen year old he spoke about earlier and another boy when the boys were in their late teens. Foster Dad testified that he and his wife adopted the two boys about three years prior to trial. Since adopting the two boys, Foster Dad and his wife have had one other placement, but those children were moved from their home to be closer to medical care because one was medically fragile.

Foster Dad testified that Jhazaria, who is in the sixth grade, is doing well in his home. He stated:

> Overall she's doing well. She's a very sweet girl, she doesn't have a mean bone in her body. She's eager to please, she want [sic] to do things that make us happy. Everything is going along well. She helps in the house. She has three A's and a C right now, we're helping her with math.

Foster Dad admitted that just days before trial an incident occurred which caused him and his wife concern about Jhazaria remaining in the placement with them. They notified DCS and by the time of trial the situation had been resolved. Prior to trial Foster Dad and his wife revoked the thirty day removal notice they gave to DCS when the incident arose. Ashley Watson, one of Jhazaria's foster care counselors, testified about this incident and explained:

> Jhazaria had struggled with some lying recently, whether that would be about, you know, drawing on things, her behavior in school, things of that nature. And her lying has made the Foster Parents question whether or not she wanted to be in their home. And it's not a change of their heart wanting her in their home but they were concerned that she no longer wanted to be living there and she was trying to sabotage the placement and she was trying to be removed from their home.

4

Ms. Watson was asked what was done to resolve the situation, and she stated that she, her supervisor, and Jhazaria's current foster care counselor talked to the family and then the current foster care counselor went to the home for a family session. Ms. Watson felt that the matter had been resolved.

Foster Dad testified that Jhazaria and her brother Roy get along very well. He stated that the two have little contact with his nineteen year old son simply because they have little in common and the nineteen year old works a lot and is rarely home. Since Jhazaria came to live in the foster home, she has had two visits with Kyah and Marshall, which occurred before Kyah and Marshall were relocated to New Jersey. Since the relocation to New Jersey, the Children have spoken on the phone. Ashley Watson testified that they have been in contact with Kyah's and Marshall's foster home and that the foster parents plan to bring the Children halfway during the summer to have some face-to-face visits.

After trial, the Trial Court entered its detailed Termination of Parental Rights and Final Decree of Guardianship order terminating Father's parental rights to the Children after finding and holding, *inter alia*:

[T]he Court finds the following by clear and convincing evidence.

* * *

1. The Department of Children's Services (DCS) first became involved with this extended family in 2005 when a non-relative petitioned the Juvenile Court for custody of [Kyah] and [Marshall]. The relevant pleadings related to this custody episode are contained in Exhibit #3. The relevant TFACTS (the official database for the entry of case recordings by DCS workers) recordings are contained in Exhibit #4. Gail Howell, the Guardian ad litem appointed to represent the best interests of the children in the 2005 incident, after her investigation of the circumstances of the children and of the petitioner, filed a Petition for Emergency Removal of Children. Based on the allegations in the petition the Court entered a probable cause finding regarding those children and ordered that they be placed in the temporary custody of the State of Tennessee, Department of Children's Services, effective July 19, 2005. The Department, in attempting to obtain the physical custody of those children, ascertained that the mother and father had left the State of Tennessee with the children before the entry of the Order placing the children in the custody of the Department, and were believed to be residing in the State of New Jersey. Based on the inability of the Department to successfully locate the children, the matter was dismissed.

In July, 2006 the Department received a request originating in the

5

State of Pennsylvania to do a courtesy interview with [Father] regarding the circumstances of the child, [Marshall]. The child was taken to Geisinger Medical Center in Pennsylvania with diagnoses of water intoxication and a broken right humerus. The father, [Father], who was then living in Knoxville, TN, denied knowledge of the circumstances surrounding [Marshall's] injuries. [Father] was then living with [Kacey H.] and her three children, [J'Vonta], [J'Kwan] and [J'Andre]. The TFACTS recordings for this incident were entered into evidence as Exhibit #5.

In December, 2007, New Jersey sent Tennessee a request pursuant to the Interstate Compact for the Placement of Children (ICPC) asking Tennessee to make a determination of the appropriateness of the home of [Father] for custody of [Kyah] and [Marshall]. The Tennessee Department of Children's Services investigated the circumstances of [Father] and denied the request from New Jersey to approve [Father's] home for the placement of [Kyah] and [Marshall]. See Exhibit #5.

In December, 2008, New Jersey made the placement of [Kyah] and [Marshall], with [Father] despite the Department's denial of the ICPC request. At that time five children ([J'Vonta, J'Kwan and J'Andre], [Kyah] and [Marshall]) were living in the home with [Father] and [Kacey H.]. See Exhibit #5.

Pursuant to Exhibit #6, on May 7, 2010, the Department of Children's Services filed a Petition for Temporary Legal Custody and *Ex Parte* Order asking for the Court to place [Jhazaria] and [Roy] in the custody of the State of Tennessee, Department of Children's Services. The mother, [Alicia G.], appeared on May 17, 2010, and waived and reserved her right to a preliminary hearing within three days. [Father] also appeared for the hearing and asserted that he was the biological father of Jhazaria. The Court advised that, upon DNA evidence that he was the father, he may return and request appointed counsel in the matter. On July 26, 2010, based on DNA evidence that [Father] was the biological father of Jhazaria, and based on a finding that the children were dependent and neglected due to the mother's substance abuse and homelessness and the incarceration of [Roy W.'s father], the children, [Jhazaria] and [Roy], were placed in the home of [Father] and [Kacey H.], (misnamed as Casey [H.]), on a trial home placement.

On October 25, 2010, the trial home placement ended successfully, and the children [Jhazaria] and [Roy], were placed in the full legal and physical custody of [Father] and [Kacey H.]. At that time seven children, [J'Vonta, J'Kwan and J'Andre], [Kyah], [Marshall], [Jhazaria] and [Roy

6

W.], resided in the home with [Father] and his wife [Kacey H.].

On September 27, 2013, the Department of Children's Services filed petitions regarding all seven children. Exhibit #7 is a pleading summary related to [Kyah] and [Marshall], and Exhibit #8 is a pleading summary related to [Jhazaria] and [Roy]. The Petition for Restraining Order filed in these cases alleges physical abuse by [Father] against [J'Andre] and [J'Kwan].

On February 25, 2014, by the Order Finding [J'Andre] and [J'Kwan] Severely Abused by [Father] Pursuant To T.C.A. §37-l-102(b)(23)(A) [sic], all seven children were determined to be dependent and neglected in the home of [Father] and [Kacey H.], including the three children that are the subject of the termination hearing, [Kyah], [Marshall], and [Jhazaria]. In that same Order, two other children [J'Andre] and [J'Kwan] living in the home with the children who are the subject of this termination, were found to be severely abused by [Father]. [J'Andre] and [J'Kwan] are the biological children of [Kacey H.] and [Father] is their step-father. The Order Finding [J'Andre] and [J'Kwan] Severely Abused by [Father] Pursuant To T.C.A. §37-1-102(b)(23)(A) [sic] appears in both Exhibit #7 and Exhibit #8.

That Order was not appealed and is final. In the Order, the trial Court [sic] made specific findings of fact as follows:

On September 22, 2013, J'Kwan was asked to go upstairs and clean his room. [Father] went upstairs to check J'Kwan's progress and became upset when J'Kwan was not cleaning his room. [Father] began pushing J'Kwan around the room. J'Kwan told [Father] to stop pushing him and to get away from him. [Father] punched J'Kwan in the ribs and pushed J'Kwan against the door. [Father] put his hands around J'Kwan's neck. Kyah, upon witnessing the abuse by [Father], went downstairs to get [Kacey H.]. [Kacey H.] came upstairs with J'Andre and J'Vonta following her. Upon entering J'Kwan's room, J'Kwan was observed on the floor on his back, crying, with [Father] standing over him. [Kacey H.] asked them what was going on and separated [Father] from J'Kwan.

J'Andre came into the room and began telling [Father] that he was tired of [Father] picking on J'Kwan and that J'Kwan had not done anything. [Father] jumped over [Kacey H.] as J'Andre was heading down the hall in an attempt to get to J'Andre. [Father] grabbed J'Andre in a chokehold in an attempt to strangle him, causing them both to fall to the ground. J'Andre had his chin pushed down against his neck and his arms at his neck, underneath [Father's] arms in an attempt to keep [Father's] chokehold from getting tighter around his neck. However, J'Andre was not strong enough to break

out of [Father's] chokehold.  [Kacey H.] pushed [Kyah] into her room to get her out of the way and [J'Vonta] went into another bedroom with Marshall and Roy and shut the door.  [Kacey H.] interceded and was able to separate J'Andre and [Father].

[Father] went downstairs.  [Father] then became physical with [Kacey H.] and J'Andre, upon witnessing the altercation between [Father] and [Kacey H.], called the police.  [Father] was walking through the house, baiting the children by saying that he wished that they would "try me."  The police came and arrested [Father].

Both J'Andre and J'Kwan had marks around their neck following the incident.  J'Andre also had several red marks/scratches on his back.

All of the children were present at the time of the abuse and witnessed various acts of abuse by [Father] to J'Kwan and J'Andre.  Several of the children were crying and very upset at what they observed, especially Jhazaria and Marshall.

[Father] had several previous incidents of inappropriate physical discipline with the children.  A few weeks prior to the incident between [Father], J'Andre, and J'Kwan, [Father] hit J'Kwan with a pillow when J'Kwan was crying.  [Father] then told J'Kwan to "shut up" and threw him to the ground and put his knees on J'Kwan's chest.  [Father] had also previously pushed [J'Vonta] on the bed and sat on top of him.

On January 2, 2014, [Father] broke a window and entered the home where the children were present with their cousin.  [Kacey H.] became alarmed when she attempted to call from work to check on the children and no one answered the phone.  Upon her returning home, she found [Father] sitting on the couch.  She immediately called the police.  A verbal altercation ensued and [Father] picked up a baseball bat telling [Kacey H.] that he was "going to jail anyway" and began chasing [Kacey H.], hitting her with the baseball bat.  The cousin intervened and was able to stop [Father] from hitting [Kacey H.].  [Father] left the residence and began hitting [Kacey H.'s] car and the front door of the residence with the baseball bat.  [Father] left prior to the police arriving but returned after the police left to retrieve items that he had left at the residence.  Some of the children including J'Andre and [J'Vonta] witnessed the physical altercation between [Father] and [Kacey H.].

After the entry of the Order Finding [J'Andre] and [J'Kwan]

8

Severely Abused by [Father] Pursuant To T.C.A. §37-l-102(b)(23)(A) [sic], [Kacey H.] notified the Court that she had lost her housing and would no longer be able to provide for the appropriate care and supervision of the children, [Kyah], [Marshall], and [Jhazaria].

The temporary custody of [Kyah], [Marshall], and [Jhazaria] was awarded to the State of Tennessee, Department of Children's Services, on February 27, 2014, by Ex-Parte Bench Order - Custody to DCS Dependency & Neglect, and by the Agreed Order of May 7, 2014, at the final hearing; they have been in foster care continuously since that date. That Order is contained in both Exhibit #7 and Exhibit #8.

2. The termination petition with regard to the four [sic] children was filed against [Father] on November 21, 2014. He was served with a summons and copy of the petition by personal service on December 8, 2014.

### III

1. The family services worker (FSW), Kendrise Colebrooke, testified that the Orders entered in this case provide for the father to have no contact with any of these four [sic] children. That information appears in the *Ex Parte* Restraining Order entered by the Court on September 27, 2013, the Order of Continuance arising from the hearing on October 1, 2013, and the Order Finding [J'Andre] and [J'Kwan] Severely Abused by [Father] Pursuant To T.C.A. §37-1-102(b)(23)(A) [sic] arising from the hearing on February 25, 2014. The latter two Orders provide direction to the father on the steps to take to modify those no-contact provisions. Ms. Colebrooke also testified that the permanency plan which was developed also provided [Father] direction on how to modify the no-contact provisions of the Orders. The father has never provided any proof that he completed any of the responsibilities identified. Therefore, the no-contact provisions remain in place.

2. The father pled guilty to the amended charge of misdemeanor assault, which was originally charged as a felony aggravated assault (strangulation) regarding the domestic violence incident which occurred on September 22, 2013, and which was the subject of the Department's September 27, 2013, Petition for Restraining Order, and which was the subject of the severe abuse Order entered from the hearing on February 25, 2014. See collective Exhibit #9.

Between the time of the filing of the Department's Petition for

9

Restraining Order on all seven children on September 27, 2013, and the hearing on February 25, 2014, the father, on January 2, 2014, entered the mother's home, after which the mother returned home. Before the father left, he picked up a baseball bat and stated that he knew he would be arrested and he "should make it worth it." He struck the mother twice in the right side of the face and on the right leg with the baseball bat. The children were present in the home when the incident occurred. The father pled guilty, on April 17, 2014, to the Class C Felony charge of Aggravated Assault and Aggravated Burglary, which arose from that incident. The father was sentenced to incarceration and was incarcerated following the guilty plea and remains incarcerated, having been transported to the termination hearing from prison. See Exhibit #9.

3.     Upon these facts, the Court finds, pursuant to T.C.A. 36-l-113(g)(4), that [Father] has been found to have committed severe child abuse against [J'Andre] and [J'Kwan], and that the children, [Kyah], [Marshall], and [Jhazaria], resided in the home with [Father] and [J'Andre] and [J'Kwan] at the time of the incident resulting in the severe abuse finding. Thus the Department has met its burden of proof regarding the severe abuse ground alleged.

4. The Court additionally finds, pursuant to T.C.A. 36-l-102(l)(A)(iv), that the father was incarcerated at the time of the filing of the Department's termination petition on November 21, 2014, and that he had been incarcerated since at least April 17, 2014. Prior to his incarceration, [Father] engaged in conduct that exhibits wanton disregard for the welfare of the children. He attacked the children [J'Kwan] and [J'Andre] and was found to have committed severe abuse as a result of that attack. Before the February 25, 2014, hearing on the issue of severe abuse, the father entered the mother's apartment with the children in the home and attacked the mother with a baseball bat. He pled guilty to both offenses. Both incidents amount to wanton disregard for the welfare of the children. Thus the Department has met its burden of proof regarding the wanton disregard grounds alleged.

5. The Court heard testimony from the FSW that the foster home for [Kyah] and [Marshall] is a placement in which the children have flourished and in which the children can have a forever family should the Court terminate parental rights to the children.

6. The Court heard testimony from a Youth Villages representative and the foster family for Jhazaria that, although that placement is only of four months duration, and there has been one incident causing a re-

examination of the placement, the foster home is an appropriate placement willing to also be a forever home for Jhazaria, should she become available for adoption.

7. The Court received current photographs of all three children as Exhibit #10.

IV

1. [Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in his home. Although mentioned in closing by [Father's] counsel that [Father] participated in programs available in prison related to alleviating the conditions that led to custody, such was not in the testimony presented to the Court. [Father] has not visited with his children. He has presented no proof to the Department that he had accomplished the tasks set forth for him to have the no-contact provisions of prior orders modified to allow contact.

2. A change of caretakers and physical environment from their respective foster home is likely to have a detrimental effect on the children's emotional and psychological condition. As the father remains incarcerated, he would be unable to provide any home for the children until he is released from prison.

3. [Father] has committed severe child abuse toward two children of his spouse while he, the spouse, and seven children, including the victims, lived in the same home. He has yet to provide a healthy and safe physical environment for the children as he remains incarcerated.

4. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

5. The children are entitled to a safe, secure and loving home. They need to know where they will lay their heads at night, to know and understand that their parents will protect them and provide them with consistent care and supervision. They now have the chance to achieve permanency through adoption in such a home, with committed, loving foster parents. The time in a child's life is short. It would be cruel to move these children or to extend the limbo of foster care.

6. It is, therefore, in the best interest of [Kyah], [Marshall], and

11

[Jhazaria], and the public that all of [Father's] parental rights to these children be terminated and the complete custody, control, and partial guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption <u>in loco parentis.</u>

Father appeals the termination of his parental rights.

## **Discussion**

Although not stated exactly as such, Father raises three issues on appeal: 1) whether the Trial Court erred in finding by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv); 2) whether the Trial Court erred in finding by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4); and, 3) whether the Trial Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

> In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct.

1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first consider whether the Trial Court erred in finding by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102-(1)(A)(iv). As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2014). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

13

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014).

We need not reiterate in full the Trial Court's detailed and specific findings with regard to this issue, which are quoted more fully above, but we do note that with regard to this issue the Trial Court specifically found and held:

that the father was incarcerated at the time of the filing of the Department's termination petition on November 21, 2014, and that he had been incarcerated since at least April 17, 2014. Prior to his incarceration, [Father] engaged in conduct that exhibits wanton disregard for the welfare of the children. He attacked the children [J'Kwan] and [J'Andre] and was found to have committed severe abuse as a result of that attack. Before the February 25, 2014, hearing on the issue of severe abuse, the father entered the mother's apartment with the children in the home and attacked the mother with a baseball bat. He pled guilty to both offenses. Both incidents amount to wanton disregard for the welfare of the children. Thus the Department has met its burden of proof regarding the wanton disregard grounds alleged.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

We next consider whether the Trial Court erred in finding by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4). As pertinent, Tenn. Code Ann. § 36-1-113(g)(4) provides:

> (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

Tenn. Code Ann. § 36-1-113(g)(4) (2014). As pertinent to this issue, Tenn. Code Ann. § 37-1-102 provides:

> (21) "Severe child abuse" means:
>
> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

Tenn. Code Ann. § 37-1-102(b)(21)(A)(i) (2014).

The Trial Court made detailed and specific findings with regard to this issue, which we need not reiterate in full as they are quoted more fully above. We, however, note that the Trial Court specifically found and held:

> The father pled guilty to the amended charge of misdemeanor assault, which was originally charged as a felony aggravated assault (strangulation) regarding the domestic violence incident which occurred on September 22, 2013, and which was the subject of the Department's September 27, 2013, Petition for Restraining Order, and which was the subject of the severe abuse Order entered from the hearing on February 25, 2014. See collective Exhibit #9.
>
> Between the time of the filing of the Department's Petition for Restraining Order on all seven children on September 27, 2013, and the hearing on February 25, 2014, the father, on January 2, 2014, entered the mother's home, after which the mother returned home. Before the father left, he picked up a baseball bat and stated that he knew he would be arrested and he "should make it worth it." He struck the mother twice in

the right side of the face and on the right leg with the baseball bat. The children were present in the home when the incident occurred. The father pled guilty, on April 17, 2014, to the Class C Felony charge of Aggravated Assault and Aggravated Burglary, which arose from that incident. The father was sentenced to incarceration and was incarcerated following the guilty plea and remains incarcerated, having been transported to the termination hearing from prison. See Exhibit #9.

3. Upon these facts, the Court finds, pursuant to T.C.A. 36-1-113(g)(4), that [Father] has been found to have committed severe child abuse against [J'Andre] and [J'Kwan], and that the children, [Kyah], [Marshall], and [Jhazaria], resided in the home with [Father] and [J'Andre] and [J'Kwan] at the time of the incident resulting in the severe abuse finding. Thus the Department has met its burden of proof regarding the severe abuse ground alleged.

A careful and thorough review of the record on appeal reveals that the evidence, which is discussed more fully above, does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

Finally, we consider whether the Trial Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated. When making a determination regarding best interest, a trial court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i).

With regard to this issue, the Trial Court specifically found and held:

1. [Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in his home. Although mentioned in closing by [Father's] counsel that [Father] participated in programs available in prison related to alleviating the conditions that led to custody, such was not in the testimony presented to the Court. [Father] has not visited with his children. He has presented no proof to the Department that he had accomplished the tasks set forth for him to have the no-contact provisions of prior orders modified to allow contact.

2. A change of caretakers and physical environment from their respective foster home is likely to have a detrimental effect on the children's emotional and psychological condition. As the father remains incarcerated, he would be unable to provide any home for the children until

he is released from prison.

3. [Father] has committed severe child abuse toward two children of his spouse while he, the spouse, and seven children, including the victims, lived in the same home. He has yet to provide a healthy and safe physical environment for the children as he remains incarcerated.

4. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

5. The children are entitled to a safe, secure and loving home. They need to know where they will lay their heads at night, to know and understand that their parents will protect them and provide them with consistent care and supervision. They now have the chance to achieve permanency through adoption in such a home, with committed, loving foster parents. The time in a child's life is short. It would be cruel to move these children or to extend the limbo of foster care.

6. It is, therefore, in the best interest of [Kyah], [Marshall], and [Jhazaria], and the public that all of [Father's] parental rights to these children be terminated and the complete custody, control, and partial guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We find no error in the Trial Court's determination that termination of Father's parental rights to the Children is in the Children's best interest.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Marshall H.

_____
D. MICHAEL SWINEY, JUDGE